IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARMELLA BROWN, | ) | |
| | ) | Civil Action No. 17 CV 08473 |
| Plaintiff, | ) | |
| | ) | Judge Thomas Durkin |
| vs. | ) | |
| | ) | Magistrate Judge Martin |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF CARMELLA BROWN'S RESPONSE TO CTA'S MEMORANDUM IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

**<u>Table of Contents</u>**

**<u>Table of Authorities</u>**

**<u>Response Brief</u>**

Andrew J. Cohen, Esq. (#06215895)
Marshall J. Burt, Esq. (#0619881)
77 West Washington Street, Suite 1300
Chicago, Illinois 60602
(312) 419-1999
acohen@cohenlawchicago.com

**TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................................1

**FACTS** .................................................................................................................1

**STANDARDS FOR SUMMARY JUDGMENT** ...............................................7

**ARGUMENT** ......................................................................................................7

   **I.**   **CTA Violated Brown's Right to Equal Pay** ..........................................7

   **II.**  **CTA Retaliated Against Brown** ...........................................................12

      **1) Plaintiff Suffered an Adverse Employment Action**............................13

         **A.**   **Removal of Disciplinary Responsibilities** ...........................13

         **B.**   **Loss of "Filling In" for Upper Management and Promotion** .........14

         **C.**   **Ban on Speech and Contact With Hundreds of Her Employees** ....14

         **D.**   **Prohibited from Using the Bathroom Facility at Her Workplace**..15

         **E.**   **Denied Equal Pay and Benefits**............................................15

         **F.**   **Transferred to Another Facility and Denied Training**...................15

         **G.**   **Plans to Remove Brown from CTA**......................................16

      **2)  A Causal Connection Exists Between Protected Activity and Adverse Action** ....................................................................................16

   **III.** **CTA Discriminated on the Basis of Sex and Race**............................18

      **1) The Evidence Supports Discrimination Under Ortiz** ......................18

         **A.**   **CTA Engaged in Sex Discrimination** .................................18

         **B.**   **CTA Engaged in Race Discrimination**................................19

      **2)  Plaintiff Established a Prima Facie Case of Race/Sex Discrimination** ...............................................................................19

**CONCLUSION** ................................................................................................20

## **TABLE OF AUTHORITIES**

### **Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)....................................................7

*Atanus v. Perry*, 520 F. 3d 662, 677 (7th Cir. 2008)...........................................................13

*Baines v. Walgreen Co.*, 863 F.3d 656, 661-62 (7th Cir. 2017).............................................17

*Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974) ...........................................12

*Courtney v. Biosound*, 42 F.3d at 414, 423(7th Cir. 1994)....................................................20

*Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 786 (7th Cir. 2004) .........12

*Dey v. Colt*, 28 F.3d 1446, 1458 (7th Cir. 1994)..................................................................17

*Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994)..................................7

*Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003)..............................................16

*Egger v. Phillips*, 669 F.2d 497, 502 (7th Cir. 1982)...........................................................7

*Fares Pawn, LLC v. Indiana Department of Financial Institutions,*

     755 F.3d 839, 845 (7th Cir. 2014)...................................................................................9

*Farrell v. Butler University*, 421 F. 3d 609, 614 (7th Cir. 2005).........................................7,15

*Ferrill v. Oak Creek-Franklin Joint Sch. Dist.,*860 F.3d 494, 499-500 (7th Cir. 2017)........19

*Greengrass v. International Monetary Systems Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).....17

*Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)..................................9

*Karum Holdings LLC v. Lowe's Cos*, 895 F.3d 944, 951 (7th Cir. 2018)............................10

*Lewis v. City of Chicago*, 496 F. 3d 645 (7th Circ. 2007)....................................................13

*McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir.2004) ...............................9

*Monroe v. Indiana DOT*, 2017 U.S. App. LEXIS 17977, *13 (7th Cir. 2017)......................17

*Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013)....................................................17,18

*Musser v. Gentiva Health Servs., Inc., 356 F.3d 751, 755 (7th Cir. 2004)* ..........................*10*

*Ortiz v. Werner Enters., 834 F.3d 760, 765 (7th Cir. 2016)* ...................................................*7,18*

*Porter v. City of Chi., 700 F.3d 944, 954 (7th Cir. 2012)* ......................................................*7*

*Stopka v. Alliance of Am. Insurers, 141 F.3d 681, 685 (7th Cir. 1998)* ...............................*11*

*Weisbrot v. Med. Coll. of Wisconsin, 79 F.3d 677, 681-82 (7th Cir. 1996)* ..........................*20*

*Williams v. Office of Chief Judge of Cook Cnty., 839 F.3d 617, 626 (7th Cir. 2016)* ...........*18*

*Young v. Control Sos, LLC, Case No. 15-cv-3162 (N.D. Ill. Jun. 19, 2017)* ........................*19*

## Statutes

*Fed. R. Civ. P.  37(c)(1)* .........................................................................................................*10*

*Fed. R. Civ. P. 26(a) or (e)* .....................................................................................................*10*

*29 U.S.C. § 206(d)(1)* ..............................................................................................................*12*

*42 U.S.C. § 2000e-2(a)(1)* .......................................................................................................*7*

## PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Plaintiff Carmella Brown ("Brown"), a black female, worked for the CTA for decades and reached the level of General Manager ("GM") for Rail Maintenance ("RM"). Being the only female GM in a male dominated workplace, her employees challenged her instructions and authority. Instead of ending the behavior, the CTA reinforced the misogyny by endorsing the employees' position and admonishing Brown to adapt.

Racial issues also permeated the workplace. A high level official, Donald Bonds ("Bonds"), demanded Brown ignore disciplinary issues of black employees while encouraging her to hold non-black employees strictly accountable to CTA standards. When she rejected his demands, Bonds stripped Brown of her management responsibilities, denied her career opportunities, barred her from using the bathroom and left her disrespected by her employees.

Brown was also paid significantly less than her white male counterparts. When she complained, her quest for equal pay and job were threatened. Although Defendant's own internal investigators acknowledged this mistreatment, they took no remedial action. The evidence as a whole demonstrates that Plaintiff suffered sex and race discrimination, retaliation and was denied equal compensation. Therefore, CTA's Motion for Summary Judgment must be denied.

## Facts[1]

The CTA maintains two separate and distinct transportation divisions - Rail Operations and Bus Operations. PF:1. The divisions differed in vehicles, locations, facilities, skillsets, employees, and management structure. PF:1. For instance, the Rail GMs were supervised by the Rail Mechanical Officer ("RMO"), while Bus GMs answered to either the Director of Bus Maintenance or the Director of Vehicle Maintenance. PF:1.

---

[1]       Citations: Responses to CTA's Facts "PR:#"; Plaintiff Additional Facts "PF:#"; CTA's Facts "DF:#".

Brown, a black female, began her career with CTA's Rail Operations in 1993. PF:2; DF:5. With her experience as an apprentice electrician, she qualified to start as a highly skilled Car Repairer. PF:2. Over the years, Brown was promoted through the ranks to Leader (Foreman), RM Manager, Senior Manager and finally, in June 2014, to General Manager ("GM"). PF:2; DF:10,11.

At various periods, the four Rail GMs included Brown, Thomas Matuszak ("Matuszak")(white male), Thomas Dietrich ("Dietrich")(white male) and William Dorsey ("Dorsey)(black male). PF:3; PR:12. These GMs were equal in hierarchy, all directly supervised by the RMO who in turn answered to the VP of Vehicle Maintenance ("VPVM"). PF:3,12,15,16. Rail GMs were interchangeable and were periodically rotated between each other's locations to provide experience with CTA's facilities/railcars. DF:36; PF:12,16. The most recent transfer occurred in 2017 and involved Matuszak, Brown and Dorsey switching locations. DF:36.

As a GM of RM West, Brown oversaw four CTA locations, was in charge of approximately 250 people, 750 rail cars and an operating budget of almost $43 million. In comparison, her white male GM counterparts, Matuszak and Dietrich, when assigned to Rail Heavy Maintenance ("HM"), were responsible for just one location and with an operational budget of just $18 million. PF:40. Moreover, HM was a 9-5 job involving only railcar repairs while RM West was a 24-7-365 job, including repairs, transit service and field work. PF:13. Matuszak's limited exposure outside of HM resulted in him requiring more learning, hands on experience and fieldwork. PF:13.

Matuszak was hired by CTA twelve years after Brown and arrived having no prior rail experience. PF:4,5; DF:45. When Brown was promoted to GM, she, Matuszak and Dietrich were earning approximately the same amount. PF:14. However, as of mid-2015 Matuszak and Dietrich's compensation rose to $126,170 while Brown's reached just $115,908. PF:14; DF:11. The only increases Brown received during this period were organization-wide. DF:11; PR:11. The other

2

black Rail GM, Dorsey, was paid the same salary as Brown despite having had an assignment in Heavy Maintenance. DF:12; PR:12. Although Brown was never disciplined, both Matuszak and Dorsey were disciplined for improper hiring practices. PF:37; DF:54

Bonds agreed that Brown's salary should have been on par with Matuszak and directed her to craft a memo recommending that her salary be equalized due to her greater experience, tenure and responsibilities. PF:15. Although the letter was accurate, Bonds failed to sign the memo and had no recollection of submitting it. PF:15; PR:18. Instead, he claims to have campaigned for broad salary consistency across Rail, not for Brown's compensation in particular. PF:15; PR:18. Brown complained repeatedly, though the salary disparity was never corrected. PF:12,14,17. CTA's internal EEO investigation found Brown's inequality troubling and determined "experience and merit" were not responsible for any gap with Matuszak. PF:17.

Brown was the only female Rail GM in a predominantly male workforce. PF:3,6. When Brown's subordinates ignored her directives, Bonds explained "[s]ome men have issues taking direction from a woman." PF:32. In violation of their own policies, CTA's response was to sympathize with the misogynists and to admonish Brown for her management style. DF:17; PF:32. Bonds repeatedly criticized her for being "too aggressive" and instructed her to "soften her approach." PF:32. "Aggressive" meant requiring her employees to do their job properly. PF:32; PR.26.

After Bonds became RMO, he demanded Brown favor black employees and exempt them from disciplinary action. PF:18,19; PR:29. He explained that blacks must take care of other blacks, or they were not being true to their black identity. PF:18,19. Bonds repeatedly demanded that as blacks they need to stick together claiming the whites did the same. PF:18; PR:33. Accordingly, he permitted her only to discipline whites and non-blacks. PF:18,19;26,27,28,31. When she

rejected Bonds' discrimination, he engaged in a series of retaliatory actions to force her compliance and ultimately to push her out of her job. PF:27,28,29,30,31,33,35.

Initially, Bonds required that Brown only discipline employees at CTA Headquarters, not in the field as all other GMs were permitted. PF:28; PR:26. This change necessitated lengthy pre-planning, scheduling and hours of roundtrip travel between terminals and headquarters. Previously, only termination was performed at headquarters. When she again attempted to discipline employees without regards to race, Bonds demanded that any discipline she proposed must first be approved through him. PR:29. Although he rejected any discipline of blacks, she nevertheless persisted. PR:29. Ultimately, Bonds revoked her authority to discipline blacks completely. PF:28.

To further isolate Brown from her staff and neutralize her authority as a manager, Bonds prohibited only her from speaking and dealing with any of her 200+ subordinates. PR:34; PF:27. Instead, she was only allowed communication with her four senior managers. PF:27. Due to the inability to address her employees, she was prevented from leading and attending the regular Rap Sessions and Toolbox Talks with her employees. PF:27. Again, her GM peers were not subject to these restrictions on their management authority. PF:27.

Brown's earnings and career advancement options decreased. PF:22. Bonds prevented her from "filling in" or serving in an "acting" capacity for the RMO or VPVM positions. PF:21. Filling in provided knowledge of the position and experience in performing the job. PF:22. In addition, when serving more than a few weeks, additional compensation was provided to the GMs. PF:22. Finally, the experience of acting in those roles contributed to obtaining the position when a vacancy arose. PF:22. After Roberts initially allowed Brown to fill in, Bonds admonished him to discontinue the practice immediately. PF:21. Matuszak, in comparison, was provided countless fill

in opportunities which subsequently led to Bonds appointing him as acting RMO in September 2017. PF:21,23. Brown did not have an option of applying for that position since it was not posted and Bonds assigned it to Matuszak. PF:23. In his new role, Matuszak's salary jumped again to $134,796.89 while Brown's remained stagnant. PF:23.

Although there was an expectation that GMs were to perform spot checks and line rides, the policy was only enforced against Brown. PF:35. Because these tasks frequently brought her into contact with her subordinate level employees (previously prohibited by Bonds), Brown was often forced to perform these duties outside of her normal shift on nights and weekends. PF:35. Matuszak, on the other hand, admitted that he only sporadically performed a small portion of the mandated work and failed to file the required reports, unlike like Brown. PF:36. Matuszak was not disciplined for his dereliction of duty. PF:36.

To exert additional hardship, Bonds told Brown to avoid using the bathroom at her Des Plaines facility. PF:9. Although Bonds claimed his decision was based AM's complaint for improper monitoring, the complaint was not against Brown and did not even mention her. PF:8. Brown avoided the bathroom except on one occasion when she was working alongside her manager Roberts. PR:24. After her hands became saturated with grease, Roberts told Brown to clean up using the bathroom sink. PR:24. Knowing of Bonds' bathroom directive, Roberts remained to monitor the situation. PR:24. When Bonds' learned of this event, he issued her a direct order to never use the bathroom again. PR:24. Bonds suggested she find a restaurant nearby when she needed to use the bathroom. PR:23. For the next three to four months, Brown drove to a bathroom at a Starbucks approximately 2 miles away. PF:9,10. No other CTA employee was ever banned from using a bathroom in their workplace. PF:11. When Human Resources discovered the order, the prohibition was lifted and it was confirmed that under CTA policy an employee can

never be prevented from using any restroom. PF:11.

Brown had repeatedly complained verbally and in writing about her mistreatment by Bonds, including an internal EEO complaint for discriminatory and retaliatory conduct. PF:9,11,12,26,29. As a result of her rejection of Bonds demands and her related complaints, Bonds threatened that she would never see a pay raise or a new car. PF:20. Her employment was also jeopardized when he ominously stated that she would not have a future with the CTA. PF:20.

In July 2016, Brown filed a charge with the EEOC for sex (female) and race (black) discrimination and retaliation. DF:2. While the charge was pending, Brown, Matuszak and Dorsey were subject to lateral transfers by rotating locations. PF:33; DF:36. Brown was sent from Maintenance West to the Maintenance East at Howard Street, resulting in a significantly further commute. PF:33; DF:36. In her new assignment, only 5000 series railcars were maintained, compared to 2600 and 3200 series cars at Des Plaines. PF:33;DF:36. Dorsey was sent to Maintenance West (Des Plaines) while Matuszak was placed at Heavy Maintenance (Skokie). DF:36. Dorsey, Matuszak and Brown had little to no experience with the 5000 series rail cars at the time of the transfers. PR:37; PF:33.

Since Brown had experience on 5000 series railcars when arriving at East, she frequently requested training. PR:38;PF:33. However, despite the existence of specialized training on that series, all her requests were denied. PF:33; PR:38. Instead, Brown was forced to work extra hours in order to self-train to avoid being fired for a lack of knowledge. Roberts believed that her transfer to East was an attempt to make her look bad. PF:34. This was consistent with Bonds longstanding desire to push Brown out of the CTA for refusing to favor blacks. PF:19,20,25,29. Despite the significant experience with the 5000 series cars she gained at East, Brown's compensation languished compared to the increases/promotions given to Matuszak and Dietrich. PF:14,21,22,23,

## Standards for Summary Judgment

In ruling on a motion for summary judgment, "the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the evidence is subject to conflicting interpretations or if reasonable people might differ as to its significance, summary judgment is inappropriate. *Egger v. Phillips*, 669 F.2d 497, 502 (7th Cir. 1982). Where there is doubt about the existence of a material fact, then those doubts are resolved in favor of the nonmoving party and summary judgment ought to be denied. *Doe*, 42 F.3d at 443.

## I. CTA VIOLATED BROWN'S RIGHT TO EQUAL PAY

Brown was paid significantly less than comparable non-black, male GMs in RM. PF:14. Title VII makes it unlawful for an employer to "... discriminate against any individual with respect to [her] compensation … because of such individual's ... race …[or]... sex." 42 U.S.C. § 2000e-2(a)(1). To prove a claim of sex or race discrimination under Title VII, a plaintiff must point to evidence that, considered as a whole, would "permit a reasonable factfinder to conclude" that the plaintiff's sex or race caused an adverse employment action. *Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016). Unequal pay on the basis of race and/or sex is an adverse employment action. See *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012); *Farrell v. Butler University*, 421 F. 3d 609, 614 (7th Cir. 2005). The Defendant overlooks the standard in *Ortiz* and instead argues that Brown cannot establish a *prima facie* case of pay discrimination by restricting its analysis solely to the burden shifting approach of *McDonnell-Douglas*. While that is one method of proving discrimination, it is not the exclusive method. See, *Ortiz*, 834 F.3d 760 (7th Cir. 2016). Under either method, Brown has sufficient evidence to defeat summary judgment.

First, under an *Ortiz* based analysis, the evidence shows that the CTA discriminated against Brown by paying her less than her white male counter-parts, Matuszak and Dietrich. Defendant admits that Brown was being paid unequally from Matuszak, who held the same level GM position as Brown on the RM organizational structure. PF:12,15,16. Even Bonds agreed that Brown's salary should had been on par with Matuszak's salary because of her greater experience, tenure and responsibilities. PF:15. Matuszak was paid approximately $13,000 more than Brown despite having substantially less responsibilities with respect to the number of terminals he managed, the number of railcars he oversaw and having a budget less than half of Brown's. PF:12,13,14,16,40. Furthermore, unlike Brown, Matuszak lacked learning, hands-on experience and field exposure to other terminals. PF:13. CTA's own investigation acknowledged that this pay disparity cannot be explained by either experience or merit. PF:17. It can, however, be explained by race and sex.

Instead of helping Brown achieve parity, Bonds leveraged the issue against her. After Brown complained about discrimination and unequal pay, Bonds told her she would never see a pay raise. PF:19,20. True to his word, except for across-the-board CTA salary increases, Brown never received a pay increase even while the salaries of her white male counterparts continued to rise. PF:12,14,15,17. In addition to this direct evidence, which is independently sufficient to defeat summary judgment on the compensation issue, Brown alternatively is able to support her unequal pay claim under the *McDonnell-Douglas* framework.

A *prima face* case of discrimination under *McDonnell-Douglas* requires the plaintiff to show that: (1) she is a member of a protected class; (2) she was fulfilling CTA's legitimate performance expectations; and (3) she suffered an adverse employment action where she was paid a lower salary than a "similarly situated" male employees. [Def. Br. p. 17] The CTA only challenges the third element, arguing that Brown is not similarly situated to Matuszak or Dietrich,

both white males. [Def. Br. pp. 17, 19]. "Courts should apply a 'common sense' factual inquiry – essentially are there enough common features between the individuals to allow a meaningful comparison" *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) To be similarly situated, a plaintiff typically demonstrates that her performance, qualifications, and conduct were comparable to that of a member of the non-protected class. *Id.* at 404. There is not a "magic formula," however, and the similarly-situated inquiry should not devolve into a mechanical, "one-to-one mapping between employees." *Id.* at 405. Generally, "whether individuals are similarly situated is a factual question for the jury." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir.2004). Accordingly, summary judgment is only appropriate "where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *Fares Pawn, LLC v. Indiana Department of Financial Institutions*, 755 F.3d 839, 845 (7th Cir. 2014).

CTA argues that Brown is not similarly situated to Dietrich and Matuszak because "they had more overall experience, experience with the 5000 series rail cars, more time in the GM position and both of them served as HM GMs which traditionally pays more." [Def. Br. p. 17] Yet CTA's own investigative report refutes all of these assertions specifically finding that experience and merit did not justify the pay disparity between Brown and Matuszak. PF:17. This finding alone creates a disputed issue of material fact.

Moreover, Dietrich and Matuszak's time in the GM position and their 5000 series and HM experience do not justify their substantially greater salaries. First, CTA admitted that Matuszak and Brown possessed the same level of knowledge of the 5000 series cars. PF:33;PR:37. Second, in June 2014 when Brown was promoted to the GM position, her salary was on par with Dietrich and Matuszak, despite her lesser GM experience, unfamiliarity with the 5000 series rail cars and lack of a HM placement. PF:14. Specifically, by January 2015, Brown, Dietrich and Matuszak

were paid similarly, between about $113,000 and $116,000. PF:14. Thus, for a period the salaries of Brown, Dietrich and Matuszak were equivalent despite the belated and insignificant differences CTA now asserts. That, however, changed in mid 2015 when both Dietrich and Matuszak received substantial salary increases to $126,170, while Brown's salary remained unchanged. PF:14. Even when Brown moved to the Red Line in 2017, gaining significant 5000 series experience, her salary was not raised on par with the men.

Lastly, CTA argues that Dietrich and Matuszak's experience in HM is "traditionally" paid more. The sole support for this "traditionally" paid more claim is the Michael Bowen ("Bowen") affidavit. Bowen, however, was never disclosed as a witness in the Defendant's MIDP Mandatory Disclosures or in its Answers to Plaintiff's Interrogatories. PF:39. Accordingly, Bowen's affidavit must be stricken in its entirety and his pay assertion disregarded.

Under Rule 37(c)(1), if a party fails to "provide information or identify a witness as required by Rule 26(a) or (e), "that party cannot then "use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." *Karum Holdings LLC v. Lowe's Cos*, 895 F.3d 944, 951 (7th Cir. 2018). The "exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1). *Id.* (*citing Musser v. Gentiva Health Servs., Inc.*, 356 F.3d 751, 755 (7th Cir. 2004)). Similarly, under the Court's Standing Order regarding the MIDP as well as Fed. R. Civ. P. 26(e), the duty to disclose is a "is a continuing duty, and each party must serve supplemental responses when new or additional information is discovered or revealed. Amended MIDP Standing ¶ 6. The CTA breached its continuing disclosure obligation by failing to supplement its prior discovery responses to disclose Bowen as a witness.

The non-disclosure of Bowen is extremely prejudicial. Brown has been denied an opportunity to depose Bowen or obtain documents about his alleged June 2015 investigation into

Plaintiff's salary, also never previously disclosed. Nor has the CTA disclosed the basis for Bowen's claim that HM GM position "traditionally" receives more pay. Since this 2015 information was undeniably known to the Defendant before this lawsuit began, it is extremely prejudicial for CTA to raise these alleged facts now through a previously undisclosed witness and in violation of the Defendant's affirmative MIDP obligations. Accordingly, the Bowen affidavit must be stricken. As Bowen's affidavit is the only evidence supporting the claim that the HM GM position is "traditionally" paid more, that argument is unsupported and must likewise be ignored.

Likewise, the facts do not support that HM GMs are paid more. As established above, when the Plaintiff became a GM, she was paid on par with Dietrich and Matuszak, despite both already having served as GMs in HM. PF:14; DF:11; PR:47,49. Similarly, Dorsey, a black male working at CTA since 1996, became a HM GM in 2015 and was paid the identical salary as Brown. DF:51. Simply stated, despite all three men serving rotations in HM, for a specific period of time they were all paid equivalent compensation to Brown. While the two white males, Dietrich and Matuszak, subsequently received increases to about $126,000, neither Dorsey nor Brown, the two black GMs received a similar bump. Consequently, there is no credible evidence showing that the HM position was paid "traditionally" more, except for employees who happen to be white and male.

The Plaintiff's evidence also supports a cause of action under the Equal Pay Act. To sustain a claim under the Equal Pay Act, a plaintiff must show: "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998). A pay disparity is permissible if it is "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality

of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). These exceptions are affirmative defenses on which the employer has the burden of proof. *Corning Glass Works*, 417 U.S. at 196-97 (1974).

CTA does not argue that the pay disparity at issue was made pursuant to a seniority system, a merit system, or any system which measures earnings by quantity or quality of production. That leaves a differential based on "any other factor other than sex." As demonstrated above, the CTA had no valid explanation for paying Brown less than other male GMs who performed equal work requiring substantially similar skill, effort and responsibilities. PF:17. Indeed, as CTA concedes, the GMs in RM are rotated so that they acquire skills across the RM department, the most recent of which occurred in 2017 involving Brown, Matuszak and Dorsey. PF:12; DF:36. Since there is no admissible evidence showing why one GM RM position should be paid more than another, and other evidence contradicts the claim, the CTA has failed to establish that the pay differential between Brown and her male counterparts was based on anything but sex. Accordingly, CTA is not entitled to summary judgment on the unequal pay issue under either Title VII or the Equal Pay Act.

## II.    CTA RETALIATED AGAINST BROWN

To establish retaliation, Brown need only demonstrate that she engaged in "(1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two." *Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 786 (7th Cir. 2004). Defendant acknowledges Plaintiff's many complaints and thereby concedes the first factor. Instead, Defendant contests the existence of an adverse employment action, and by default, claims that a causal connection can therefore not be established.

12

### 1.    Plaintiff Has Suffered An Adverse Employment Action

With respect to the adverse action taken by the employer, "the discriminatory acts proscribed by Title VII's anti-retaliation provision are not limited to those that affect the terms and conditions of one's employment." *Lewis v. City of Chicago*, 496 F. 3d 645 (7th Circ. 2007)(citations omitted) The test is simply whether the "challenged action must be one that a reasonable employee would find to be materially adverse <u>such that the employee would be dissuaded from engaging in the protected activity</u>." *Id.*(emphasis added)

Courts have acknowledged that "'creating a precise list of activities that constitute adverse employment actions would be impossible because of the unique circumstances of individual cases.'" *Atanus v. Perry*, 520 F. 3d 662, 677 (7th Cir. 2008) Samples of adverse actions include, but are not limited to "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] <u>significantly diminished material responsibilities</u>.'" *Id.* at 677-78 (citations omitted)(emphasis added) However, "[a]dverse employment actions should not be defined so narrowly as to give an employer a "'license to discriminate.'" *Lewis*, 496 F.3d at 654 (citation omitted)

When Plaintiff failed to participate in the wholesale discrimination of CTA non-black employees, rejected unearned and special protected status for black employees and complained to various tiers of CTA management, she suffered substantial retaliatory actions.

### A.  Removal of Disciplinary Responsibilities

Brown was severely limited and then ultimately stripped of her ability to discipline certain employees. Of the GMs, Plaintiff alone was required to perform all of her discipline at CTA headquarters instead of in the field. PF:28. This caused significant loss of her time and efficiency as the discipline had to be scheduled with the employee and she would have to spend part of her

day traveling back and forth from the field to headquarters, something typically accomplished in just minutes in the field. PF:28. As her complaints continued, Bonds required all discipline recommended by Plaintiff must be approved through him. PF:31;PR:29. This tight control allowed Bonds to outright reject or ignore every attempt by Plaintiff to discipline black employees. PF:31;PR:29. Finally, he terminated her ability to impose discipline entirely on any black employee. PF:28,31.

### B.  Loss of "Filling In" for Upper Management and Promotion

Bonds prevented Brown from "filling in" or working in an acting capacity for the RMO or VP positions. PF:21. Filling in allowed an employee to gain knowledge of the demands and responsibilities for the higher level positions and obtain experience in performing the job. PF:22. Furthermore, when a high level management position would become vacant, the experience earned by "filling in" was directly related to the likelihood of being placed in the job. PF:22. Although Plaintiff initially received a brief opportunity to fill in under Roberts, Bonds summarily ended the practice. PF:21. Apart from experience, an acting role for more than a few weeks was accompanied by a pay increase. PF:22. Accordingly, Brown lost compensation while Matuszak was provided many such opportunities and earned additional pay. As a result of this "filling in" experience, Bonds' appointed Matuszak to the position of RMO "to ensure continuity." PF:23. In addition to loss of acting pay, Brown was denied a salary increase and promotion to RMO.

### C.  Ban on Speech and Contact With Hundreds of Her Employees

Not content with removing Brown's authority to discipline, Bonds imposed speech and contact restrictions with her 200+ employees. Brown was prohibited from any contact with her frontline employees, managers and car repairers limiting her communication to her four senior managers. PF:27. No other GM's had such draconian restrictions on their ability to manage. PF:27.

The no contact restriction had implications far beyond the communications aspect. When performing her duties in the field, in order to avoid coming into contact with her own employees, Plaintiff frequently had to work outside her normal hours on nights and weekends. PF:35. Moreover, she was no longer able to lead or even participate in regular training meetings. PF:27. Missing out on these opportunities, known as Rap Sessions and Toolbox Talks, further isolated her and decimated her authority to manage the hundreds of employees for which she had responsibility. PF:27.

### D. Prohibited from Using the Bathroom Facility at Her Workplace

To make her working conditions more unbearable, Bonds told Brown to avoid the bathroom at Des Plaines. PF:9. Although he claimed his directive resulted from AM's complaint, Brown was not named or mentioned therein. PF:8. After Roberts allowed her to use the sink to clean up while under his supervision, Bonds converted his directive into a complete prohibition. PF:9;PR:24. Bonds' instructed Brown to find a local restaurant when she needed to go. PR:23;PF:9. For about 4 months, Brown was forced to anticipate when she needed the bathroom and drive to a Starbuck's 2 miles away. PF:9,10. Although other members of CTA management were aware of her predicament, no one intervened on her behalf. PF:9,10. Ultimately, CTA's EEO found Bonds violated CTA's policies but did not impose any discipline. PF:11.

### E. Denied Equal Pay and Benefits

As established above [Section I], Plaintiff was paid less than her white male peers Matuszak and Dietrich (i.e. no acting pay, equal pay or promotion). Furthermore, all her other GM cohorts received new company cars with Brown being the only exception. PF:20. See *Farrell*, 421 F. 3d at 614 (7th Cir. 2005) (denial of a raise qualifies as an adverse employment action)

### F. Transferred to Another Facility and Denied Training

Brown, and her fellow RM GMs, switched locations with each other in a series of lateral transfers. PF:33. At the time, Brown's experience focused primarily on the 2600 and 3200 series railcars. DF:36. However, she was moved to a location exclusively handling 5000 series cars. DF:36. With no prior experience, Brown repeatedly requested training which was summarily rejected. PF:33. CTA falsely claimed there was no such training despite the existence of classes. PR:38; PF:33. To preserve her employment, Brown worked hours off the clock in order to unilaterally learn the workings of the new railcars. *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003) ("A discriminatory denial of job-related training can constitute an adverse employment action under Title VII").

### G. Plans to Remove Brown from the CTA

The above actions must be viewed in the context of Bonds denying her equal pay and seeking to remove Brown from CTA. For instance, Roberts stated that Brown's transfer without training was a thinly veiled attempt to discredit Brown's competency. PF:34. He also believed that Bonds wanted to push her out. PF:25. Bonds openly retaliated against Brown by threatening her raise and job when she rejected his discriminatory demands. PF:19,20,29. Although Bonds tried to mask his conduct by soliciting Brown to create a memo supporting a pay adjustment, he neither signed the document nor recalls giving it to anyone. PR:18; PF:15. Viewed separately or as a whole, CTA's conduct constituted adverse actions of sufficient seriousness to dissuade a reasonable person from complaining.

### 2. A Causal Connection Exists Between Protected Activity and Adverse Action

CTA's argues only that a causal connection cannot exist based upon their erroneous assertion that there was no adverse action. With adverse actions established, CTA did not posit an

alternative theory against a causal connection. Accordingly, Plaintiff has satisfied this prong.

Even had CTA set forth a plausible argument, the causal connection is satisfied by showing that the defendant "would not have taken the adverse ... action but for [her] protected activity." *Greengrass v. Int'l. Monetary Systems Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Here, Bonds made direct threats that Brown would never get a raise, and even lose her job, for rejecting his demands to discriminate and then complaining. PF:19,20. Accordingly, a causal connection is established.

Alternatively, "[i]f a plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Baines v. Walgreen Co.*, 863 F.3d 656, 661-62 (7th Cir. 2017), *citing Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013). Circumstantial evidence may include (1) suspicious timing; (2) ambiguous statements; (3) evidence that similarly situated employees out-side of the protected group received better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action. *Monroe v. Indiana DOT*, 2017 U.S. App. LEXIS 17977, *13 (7th Cir. 2017) As previously established, the white male RM GMs received better treatment as their ability to discipline and speak to their employees were not infringed, they were given opportunities to fill in and earn additional money, their pay was substantially increased while Plaintiff's remained stagnant, and they were appointed to higher level positions. From a timing perspective, every instance when Plaintiff rebuffed Bonds' demands was followed closely by his removal of her management responsibilities and loss of other opportunities. "Generally, a plaintiff may establish such a [causal] link through evidence that the discharge took place on the heels of the protected activity." *Dey v. Colt*, 28 F.3d 1446, 1458 (7th Cir. 1994) Finally, CTA's excuses for its mistreatment of Brown are pretextual having been completely undermined.

CTA chose only to dispute the *prima facie* case claiming no adverse action occurred, and did not submit a legitimate business reason for its actions. Accordingly, having established a *prima facie* case, direct evidence of retaliation and the falsity of Defendant's reasons, summary judgment fails with respect to Plaintiff's retaliation claim.

## III.    CTA DISCRIMINATED ON THE BASIS OF SEX AND RACE

In determining if summary judgment is appropriate on discrimination claims, courts are required to "consider evidence as a whole, rather than by asking whether any particular piece of evidence proves the case by itself." *Williams v. Office of Chief Judge of Cook Cnty.*, 839 F.3d 617, 626 (7th Cir. 2016). The sole inquiry is whether the record contains evidence to permit a reasonable fact-finder to conclude that a prohibited factor such as race or gender caused the discharge. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Although the CTA chose to proceed under the *McDonnell Douglas* burden shifting approach, Brown may simply "eschew[] burden-shifting and present[] direct and circumstantial evidence in opposition to an employer's motion for summary judgment ..." *Morgan v. SVT, LLC*, 724 F. 3d 990, 997 (7th Cir. 2013).

### A.   The Evidence Supports Discrimination under *Ortiz*

As held in *Ortiz*, when all the evidence is "considered as a whole," a reasonable factfinder can conclude that Plaintiff's sex and race led to the improper action. 834 F.3d 760, 765 (7th Cir. 2016). Brown's evidence supports an inference of discrimination for both sex and race.

#### i.    CTA Engaged in Sex Discrimination

When her subordinate employees' were unwilling to take instruction from Brown due to her gender, CTA engaged in discrimination by supporting their choice instead of enforcing laws and their own policies against gender discrimination. DF:17; PF:29,32. Unfortunately Bonds, sharing the views of the male employees, perceived Brown negatively due to her "aggressive"

nature and directed to "soften her approach." PF:29,32. These statements reflected stereotypical and misogynistic attitudes about women in power and were not directed towards her fellow male GMs. Although the words in isolation may appear neutral, they were used in conjunction with discriminatory actions including ignoring the direction of the sole woman GM and directing her to change her management style. PF:29,32; DF:35, PR:42. This constitutes a situation "[w]hen a word or concept is so pervasively and enduringly linked to a derogatory stereotype, its use to reference individuals traditionally subject to the stereotype inherently raises the specter of motivation or bias." *Young v. Control Sols., LLC*, Case No. 15-cv-3162 (N.D. Ill. Jun. 19, 2017)

### ii. CTA Engaged in Race Discrimination

Bonds demanded that Brown, because of her race, discriminate in favor of other blacks and against whites. PF:7,18,19,26; PR:21. This same demand was not placed on her white counterparts. PF:18. When she repudiated Bonds' directives, he said she was not a true black, denied her a raise and threatened her with termination. PF:18-20. He repeatedly pointed out that they were black and said they have to look after their own while maintaining baseless illusions that white employees were doing the same. PF:18-20; PR:33.

In conjunction with the direct sex and race based statements, Brown suffered from a litany of negative actions while her white male counterparts were treated significantly better. [Section II] Thus, under an *Ortiz* global analysis, Plaintiff has established race and sex discrimination.

### B. Plaintiff Established a Prima Facie Case of Race/Sex Discrimination

Alternatively, Plaintiff has established a *prima facie* case of actionable sex and race discrimination under the burden shifting analysis. The evidence demonstrates that Plaintiff: (1) was a member of a protected class; (2) met CTA's legitimate performance expectations; (3) suffered an adverse job action; and (4) treated less favorably than a similar situated employee

19

outside of her protected class. *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.,* 860 F.3d 494, 499-500 (7th Cir. 2017) It is uncontested that Brown is female/black and performed satisfactorily. [Def. Br. p. 10] Moreover, as established above, Brown was subjected to adverse actions and her white male counterparts, Matuszak and Dietrich, were treated more favorably.

"[O]nce the employee has <u>cast doubt</u> upon the employer's proffered reasons for the [action], the issue of whether the employer [retaliated or] discriminated against the plaintiff is to be determined by the jury--not the court." *Weisbrot v. Med. Coll. of Wisconsin*, 79 F.3d 677, 681-82 (7th Cir. 1996)(emphasis added) All of CTA's excuses for its discriminatory actions have been demonstrated either false or misleading. Furthermore, CTA's threats against Brown were based directly upon her sex and race. Under both of the above methods, "even if the evidence presented by [the plaintiff] does not compel the conclusion that [her employer] discriminated against [her] when making its . . . decision, at a bare minimum it suffices to defeat [the employer's] summary judgment motion." *Courtney v. Biosound*, 42 F.3d 414, 423 (7th Cir. 1994) Therefore, a reasonable jury can find that Brown suffered discrimination on the basis of her sex and race.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Carmella Brown, respectfully requests that this Honorable Court deny Defendant CTA's Motion for Summary Judgment in its entirety and for such other relief that the Court deems just and appropriate under the circumstances.

Dated: June 20, 2019                    Respectfully submitted,
                                         CARMELLA BROWN

                                         By:  /s/Andrew J. Cohen

Andrew J. Cohen, Esq. (#06215895)(acohen@cohenlawchicago.com)
Marshall J. Burt, Esq. (#0618381)
77 West Washington Street, Suite 1300
Chicago, Illinois 60602
(312) 419-1999

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2019, a copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served to the parties via the Court's ECF filing system.

        /s/ Andrew J. Cohen     .