## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**CARMELLA BROWN**

**Plaintiff,**

v.

**CHICAGO TRANSIT AUTHORITY,**

**Defendant.**

**No. 17 cv 08473**

**Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Chicago Transit Authority's ("CTA") motion for summary judgment. Plaintiff Carmella Brown, a current employee of CTA, alleged that CTA unlawfully discriminated against her on the basis of her race and sex, and unlawfully retaliated against her for reporting that alleged discrimination, in violation of Title VII, 42 U.S.C. § 2000e *et seq.* For the reasons stated below, Defendant CTA's motion for summary judgment (Dkt. 42) is granted in part and denied in part. Brown may proceed under the theory of gender discrimination and retaliation for her refusal to participate in racially discriminatory conduct. Defendant's motion for summary judgment is granted as to Brown's race discrimination claim and her claim of retaliation based on her internal EEO and her EEOC complaint.

## BACKGROUND

### 1) Bowen Affidavit

As a preliminary matter, Plaintiff argues that Michael Bowen's affidavit should be stricken in its entirety because Defendant failed to disclose Bowen as a

witness in its MIDP Mandatory Disclosures or in its answers to Plaintiff's interrogatories. (Dkt. 48, 10-11)

Under Federal Rule of Civil Procedure 37(c)(1), if a party fails to "provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Karum Holdings LLC v. Lowe's Cos.*, 895 F.3d 944, 951 (7th Cir. 2004). Similarly, under Rule 26(e)(1)(A), parties have a continuing obligation to supplement or correct their responses. *See* Fed. R. Civ. P. 26(e)(1)(A); *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007) (holding that the plaintiff "was required by Rule 26(e) to supplement his rule 26(a) disclosures" even "after the close of discovery"). Plaintiff contends that CTA violated its obligations to supplement discovery responses by failing to produce Bowen's statements during the discovery period or before the summary judgment deadline. (Dkt. 48, 10-11)

Under Rule 37(c)(1), exclusion of non-disclosed evidence is automatic and mandatory unless non-disclosure was justified or harmless. *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012); *see also Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011) ("Whether a failure to comply with Rule 26(a) or (e) is substantially justified, harmless, or warrants [Rule 37(c)(1)] sanctions is left to the broad discretion of the district court."). "The rationale behind Rule 37 'is to avoid an unfair ambush in which a party advances new theories or evidence to which [her] opponent has insufficient time to formulate a response.'" *Only the First, Ltd. v. Seiko*

*Epson Corp.*, 822 F.Supp.2d 767, 778 (N.D. Ill. 2011) (quoting *Rowe Int'l Corp. v. Ecast, Inc.*, 586 F.Supp.2d 924 (N.D. Ill. 2008)). CTA bears the burden to "show that [its] violation of Rule 26[ ] was either justified or harmless." *Keach v. U.S. Trust. Co.*, 419 F.3d 626, 639 (7th Cir. 2005) (internal quotation marks omitted). In deciding whether to impose a remedy under Rule 37(c)(1), the "court should consider…: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial [or motion]; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012).

Plaintiff argues that she has been prejudiced by Defendant's failure to disclose Bowen because she was denied the opportunity to depose Bowen or obtain documents on which his affidavit relies. Defendant replies that Bowen's affidavit should not be stricken because Plaintiff "disclosed" Michael Bowen during her own deposition when she testified that she wrote a letter to him requesting a salary increase. (Dkt. 61, 16-17) The fact that Plaintiff was aware that Bowen worked in the CTA bureaucracy does not obviate CTA's obligation to identify him as a person "likely to have discoverable information" or the subject of that information. Defendant has failed to rebut Plaintiff's assertion that she was prejudiced by Bowen's statements first revealed as part of Defendant's summary judgment motion. Defendant's late disclosure prevented Plaintiff from examining Bowen and gathering additional evidence before responding to CTA's motion for summary judgment.

Accordingly, sanctions are warranted under Rule 37(c)(1) for CTA's failure to supplement its discovery responses with Bowen's affidavit. Plaintiff submits that the appropriate remedy is to bar the statement in its entirety. (Dkt. 48, 10-11) CTA does not request a less severe sanction, thereby forfeiting any argument that a complete bar is not the appropriate remedy. *See King v. Ford Motor Co.*, 872 F.3d 833, 838 (7th Cir. 2017) (affirming the district court's striking the declaration under Rule 37(c)(1) where the plaintiff "did not propose any alternatives to" that remedy). As a result, Bowen's affidavit is barred for the purposes of this summary judgment motion.[1]

## 2) Material Facts

The following facts are stated as favorably to Brown as permitted by the record and Local Rule 56.1. *See Woods v. City of Berwyn*, 865, 867 (7th Cir. 2015).

Brown is an African-American woman. (Dkt. 42, 2) CTA hired Brown in 1993 as a car repairer. (*Id.*) She worked her way up the ranks, first promoted to Foreman, Rail Maintenance Manager for Rail Car Appearance, Rail Maintenance Manager, and Senior Manager. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 2)[2] In June 2014, Brown was pro-moted to the position of General Manager ("GM") of Rail Maintenance ("RM"). (Dkt. 42, 2) During the pertinent time period, the four Rail GMs included Brown, Thomas

---

[1] The Court notes that even if it considered the statements within Bowen's affidavit, those statements would not change the ultimate result.

[2] CTA objects to nearly all of Plaintiff's additional statements of fact arguing that they involve hearsay, speculation, or statements in depositions where CTA objected to the questions. CTA's objections are unfounded at this stage of litigation because the non-moving party need not "'depose her own witnesses or produce evidence in a form that would be admissible at trial in order to avoid summary judgment.'" *Hummel v. St. Joseph's Cty. Bd. of Com'rs*, 817 F.3d 1010 (7th Cir. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The Court will not strike Brown's additional statements of fact.

Matuszak (white male), Thomas Dietrich (white male), and William Dorsey (black male). (*Id*.; Dkt. 49, Pl.'s Stmt. of Facts ¶ 3) All GMs including Brown reported to Stephen Roberts, a white male and Director of Rail Maintenance, from May 2015 through December 2015. (Dkt. 49, Pl.'s Additional Facts ¶ 3) Roberts reported to Donald Bonds, a black male. (*Id*.)

### A. Pay discrepancy

As a GM of RM West, Brown oversaw four CTA locations, 250 people, 750 rail cars, and an operating budget of almost $43 million. (Dkt. 48, 2) According to Brown, her white male GM counterparts, Matuszak and Dietrich, were assigned to Heavy Maintenance and were each responsible for only one location with an operational budget of $18 million. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 40) Brown asserts that the Heavy Maintenance GM position was a 9-5 job, while the RM West position was a 24-7-365 job. (*Id*. at ¶ 13). According to Brown, the GMs were equal in hierarchy, however CTA disputes this fact. (*Id*.)

CTA argues that the undisputed salary discrepancy was justified because (1) Matuszak and Dietrich had more management experience before arriving at CTA; and (2) they served as Heavy Maintenance GMs.[3] (Dkt. 42, 17). Matuszak was hired by CTA twelve years after Brown, and, according to Roberts, had less rail experience than Brown. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 4) When Brown was promoted to GM, she,

---

[3] Because the Court struck Bowen's affidavit, there is no evidence that this is a basis to differentiate among General Manager salaries. Moreover, the internal CTA investigation suggests otherwise and, according to Brown, Dorsey, the other black GM, was paid the same salary as Brown despite having a Heavy Maintenance assignment. (*Id*. at ¶ 12) Even if the Court considered the Bowen affidavit, this would be a disputed material fact.

Matuszak, and Dietrich were earning approximately the same amount. (*Id.* at ¶ 14) However, in mid-2015, Matuszak and Dietrich both received a raise that increased their salary to $126,170. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 14) Brown's salary remained the same at $115,908. (Dkt. 49, Df.'s Stmt. of Facts ¶ 11)

Brown complained to Bonds that she was making less than her white male counterparts, Matuszak and Dietrich. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 12) According to Brown, in June 2015, Bonds instructed her to prepare a memo to present to CTA management regarding the pay gap between her and Matuszak.[4] (*Id.* at ¶ 15) Bonds does not recall instructing Brown to prepare the memo, nor does he recall submitting the memo to management.[5] (*Id.*) Bonds did, however, advocate generally for salary consistency across CTA. (*Id.*) When she filed her internal EEO complaint about Bonds' behavior she raised the salary discrepancy issue. CTA's internal investigation found insufficient evidence to conclude that Bonds violated CTA's EEO Policy, but determined that the salary discrepancy between Brown and Matuszak "cannot be explained by years of relevant experience and/or merit." (Dkt. 49, Pl.'s Stmt. of Facts ¶ 17)

### B. Authority over Subordinates: Gender

Brown was the only female Rail GM in a predominantly male workforce. (Dkt. 49, Pl.'s Stmt. of Facts ¶¶ 3, 6) She argues that her subordinates occasionally ignored

---

[4] Although Bonds did not have direct control over the GMs' salaries, he had the authority to recommend that certain employees receive raises. (Dkt. 49, Ex. E, 85-87, 212-15) In his deposition testimony, Bonds claims that if Brown requested a raise, he would have approved it. (*Id.*)

[5] There is no indication in the record that there was any investigation based on this alleged memo.

her directives. In response, Bonds told Brown to "soften her approach because people have problems taking direction from a woman." (Dkt. 49, Pl.'s Stmt. of Facts ¶ 32) Brown also claims that Bonds told her she was "too aggressive." (*Id.*; Dkt. 49, Ex. A, 107:2-107:24) As a result, Bonds instructed her to not speak to her 200+ staff and subordinates. (Dkt. 49, Pl.'s Stmt. of Facts ¶¶ 27, 32) Bonds instructed her to only speak with her four senior managers. (*Id.*) This change meant she was prevented from leading and attending regular team training sessions—called Rap Sessions and Toolbox Talks—with her employees. (*Id.* at ¶ 27) Brown maintains that her GM peers were not subjected to these restrictions on their management authority, and that these changes isolated Brown from her staff and neutralized her authority as a manager. (*Id.*)

Bonds disagrees. He testified that in 2015 he received several complaints from Senior Managers and their direct reports about Brown's micromanaging and aggressive tone.[6] (Dkt. 49, Df.'s Stmt. of Facts ¶ 26). According to Bonds, he then instructed *all GMs* to follow the chain of command and not discipline frontline employees. Bonds instructed Brown and the other GMs that only Senior Managers should initiate discipline against their direct reports and frontline employees. (*Id.* at 26-27) Bonds was in the military prior to his employment with CTA and "a firm believer that his subordinate employees should follow their chain of command." (Dkt. 42, 4)

---

[6] Brown claims that she did not receive any more complaints that the other GMs. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 37) Brown also responds that Stephen Roberts, her direct supervisor, described Brown as an "exemplar employee." (*Id.* at ¶ 4)

### C. Authority over Subordinates: Race

According to Brown, Bonds instructed her to favor black employees and exempt them from disciplinary action. (Dkt. 48, 3) Brown claims that Bonds motioned to and touched the skin on his hand saying, "we got to take care of our own" and "you're not taking care of your own kind." (Dkt. 49, Pl.'s Stmt. of Facts ¶ 18) He said that blacks must take care of other blacks, explaining that white employees do the same. (*Id.*) Brown interpreted these comments to mean that Bonds wanted her to favor black employees by not disciplining them. When Brown did not heed Bonds' warnings, he told her that with the "route you're taking, you'll never see a raise." (*Id.* at ¶ 19) He told her she was not "being true to the black race," and that she should follow his demands "if you want to move forward with the company, if you want this raise, if you want this…newer car." (*Id.* at ¶¶ 19-20)

Initially, Bonds required Brown to discipline employees at CTA headquarters, and not in the field, even though other GMs were permitted to do so. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 28) According to Brown, this change involved lengthy planning, scheduling, and hours of roundtrip travel between terminals and headquarters. (Dkt. 48, 4) After Brown continued to discipline employees without regards to race, Bonds escalated, requiring any discipline she proposed be first approved by him. (Dkt. 49, Pl.'s Stmt. of Facts, ¶ 29) When she submitted discipline for approval, Bonds would deny it outright or ignore her requests. (*Id.* at ¶ 31) Ultimately, Brown believes Bonds revoked her authority to discipline black employees completely. (*Id.* at ¶¶ 28, 31)

8

Bonds denies he ever told anyone they were prohibited from disciplining black employees. (Dkt. 49, Df.'s Stmt. of Facts ¶ 29) Regarding his statements, Bonds maintains that he said or meant that they needed to take care of each other and work together because "we are all in the same department." (*Id*. at ¶ 21) CTA notes that the requirement that GMs only initiate discipline at headquarters applied to all GMs, not just to Brown. (*Id*. at ¶¶ 24, 26-27) However, Brown claims that this rule was only enforced against her, as Matuszak and Dietrich were allowed to continue issuing discipline in the field.[7] (Dkt. 49, Pl.'s Stmt. of Facts ¶ 28)

### D. Chief Mechanical Officer Position

Brown's immediate supervisor Stephen Roberts was the Chief Mechanical Officer. Serving in an acting role in this position provided experience that could lead to a promotion if a vacancy in that position arose, and, if one "filled in" for a certain period of time, additional compensation. (*Id*. at ¶ 22) After Roberts initially allowed Brown to fill in, Bonds admonished him to discontinue the practice immediately. (*Id*. at ¶ 21) Roberts testified that Bonds called him and yelled at him, insisting that he was not permitted to ask Brown to fill in for him. (Dkt. 49, Ex. B, 72-73)

In comparison, Matuszak filled in many times and was eventually promoted to acting Rail Maintenance Officer in September 2017. (*Id*. at ¶¶ 21, 23) Brown did not have the opportunity to apply for that position as it was not posted and Bonds

---

[7] In any event, CTA posits that Brown did very little disciplining. When asked about employee discipline at her deposition, Brown stated that she only disciplined one non-black employee in 2015, she does not recall disciplining any non-black employees in 2016, and she disciplined only two non-black employees in 2017. (Dkt. 49, Df.'s Stmt. of Facts ¶ 32) Brown stated that between 2015 and 2017, she wanted to discipline five black employees but was prohibited from doing so. (*Id*. at ¶ 29)

assigned it to Matuszak. (*Id.*) In this new role, Matuszak's salary increased again, while Brown's remained stagnant. (*Id.*)

CTA claims that Brown was offered several opportunities to fill in for the CMO position, but she rejected these requests. (Dkt. 49, Df.'s Stmt. of Facts ¶ 42) Brown concedes that she filled in for the CMO position "a few times." (*Id.*) However, Brown claims she only did so before Bonds ended the practice. CTA also argues that filling in did not come with any additional compensation, and notes that Brown has never applied for a position at CTA that was denied to her. (*Id.* at ¶¶ 42, 43)

### E. Line rides and spot checks

Brown believes that CTA's requirement that GMs perform spot checks and line rides was disproportionately enforced against her. (Dkt. 48, 5) All GMs were required to perform spot checks and line rides. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 35) Because these tasks frequently brought Brown into contact with her subordinate employees (and this contact was prohibited by Bonds), Brown was often forced to perform these tasks outside of her normal shift hours on nights and weekends. (*Id.*) Roberts would accompany Brown on these line rides and spot checks to help her avoid contact with frontline employees. (*Id.*) Although all GMs were supposed to comply with this rule, according to Brown and Roberts, only Brown was required to perform these tasks. (*Id.*) Roberts, Brown, and Matuszak all testified that Matuszak occasionally refused to do his line rides and spot checks and was not disciplined. (Dkt. 49, Ex. D, 137, 139; Dkt. 49, Ex. A, 175-76; Dkt. 49, Ex. B, 68-69)

10

### F. Bathroom Access

In September 2015, CTA employee A.M. complained that CTA employees were invading her privacy in a women's restroom at the Des Plaines facility.[8] (Dkt. 49, Df.'s Stmt. of Facts ¶ 24) Bonds told Brown to avoid that bathroom. (*Id.*) Brown did so, except on one occasion when she was working alongside her supervisor Roberts. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 24) Brown's hands were covered in grease, and Roberts told Brown to clean up in the bathroom sink. (*Id.*) Knowing of Bond's bathroom directive, Roberts remained to monitor the situation. (*Id.*) As Brown entered the restroom, she heard A.M. say, "cover up, cover up, she's coming." (Dkt. 49, Df.'s Stmt. of Facts ¶ 24) Brown was offended by this statement and reported it to Roberts. (*Id.*) Roberts informed Bonds. (*Id.*) After Bonds learned of this event, he ordered Brown to never use that bathroom again. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 9)

CTA maintains that there was another bathroom on site that Brown could have used. (Dkt. 49, Df.'s Stmt. of Facts ¶ 23) Brown is not aware of another bathroom on site, and when she asked Bonds where she should go to the bathroom, he suggested a public restaurant. (Dkt. 49, Pl.'s Stmt. of Facts ¶¶ 8-11) For the next several months, Brown drove two miles away to use the bathroom at a Starbucks.[9] (*Id.*) When

---

[8] A.M. complained her right to privacy was violated because CTA employees were documenting her personal activity in the restroom. CTA states that Brown and another employee had entered this particular restroom to find A.M. (Dkt. 49, Df.'s Stmt. of Facts ¶ 22) Brown counters that she was instructed by A.M.'s manager to check on A.M.'s whereabouts, and Brown looked for her in a locker room not the bathroom. (Dkt. 49, Pl.'s Stmt. of Facts ¶¶ 8, 11) Brown notes that A.M.'s complaint did not accuse Brown of violating her privacy but names a different employee, T.C. (*Id.*)

[9] There was a McDonald's closer to the Des Plaines facility, but Brown preferred the Starbucks bathroom because it was cleaner. (Dkt. 49, Pl.'s Resp. to Df.'s Stmt. of Facts ¶ 23)

CTA's Human Resources discovered Bonds' order, it lifted the prohibition and informed Bonds that "it is never allowed under CTA policy to prohibit an employee from using a bathroom." (Dkt. 49, Pl.'s Stmt. of Facts ¶ 11)

### G. Brown's Complaints of Discrimination

Brown claims that she repeatedly complained verbally and in writing about her mistreatment by Bonds. This included an internal EEO complaint, filed in December of 2015, for discriminatory and retaliatory conduct. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 17) As mentioned above, that internal complaint resulted in an investigation in which CTA found insufficient evidence to conclude that Bonds violated CTA's EEO Policy, but determined that the salary discrepancy between Brown and Matuszak "cannot be explained by years of relevant experience and/or merit." (Dkt. 49, Pl.'s Stmt. of Facts ¶ 17) Plaintiff believes that as a result of her complaints, Bonds threatened that Brown would never see a pay raise or a new company car. (*Id.* at ¶ 20) In July of 2016, Brown filed a charge with the EEOC for sex and race discrimination and retaliation. (Dkt. 49, Df.'s Stmt. of Facts ¶ 2)

### H. Transfer and Request for Training

In March or April of 2017, while Brown's EEOC charge was pending, Brown, Matuszak, and Dorsey were subject to lateral transfers. (Dkt. 49, Df.'s Stmt. of Facts ¶ 36) Brown was sent from Maintenance West to Maintenance East at Howard Street, which resulted in a significantly farther commute. (D5kt. 49, Pl.'s Stmt. of Facts ¶ 33) Her new assignment only had 5000 series railcars, with which Brown had no experience. (*Id.*) Brown had only worked with 2600 and 3200 series railcars. (*Id.*)

After the transfer, Brown requested classroom training on the 5000 series railcars but her requests were denied. CTA maintains that "there is no evidence that CTA has any specific training tailored toward the 5000 series railcars," and that the only training received by GM staff is "'hands on' or on the job training." (Dkt 42, 6) However, Bonds testified that familiarization and classroom training was available at CTA's student training center. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 33; Dkt. 48, Ex. G, 74-75)

On August 24, 2017, the EEOC issued Brown a Notice of Right to Sue. (Dkt. 49, Df.'s Stmt. of Facts ¶ 3) Brown timely filed this lawsuit. Defendant CTA moved for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgement is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the Court must construe all facts and reasonable interferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F,3d 524, 528 (7th Cir. 2014). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those

'supported by only speculation or conjecture.'" *Grant v. Trustees if Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

## **DISCUSSION**

Plaintiff presents two theories of her case: discrimination based on her sex and her race, and retaliation based on her filing complaints and her refusal to engage in racially discriminatory conduct. For the reasons sets forth below, the Court finds that Brown's claims for gender discrimination and retaliation based on her refusal to engage in racially discriminatory conduct may proceed to a jury. Defendant's motion for summary judgment is granted as to Brown's race discrimination claim and her claim of retaliation based on her internal EEO and her EEOC complaint.

### 1) Title VII—Gender Discrimination

Defendant argues that summary judgment is proper on Plaintiff's Title VII discrimination claim because Plaintiff fails to provide sufficient evidence that she suffered an adverse employment action or that similarly-situated male employees were treated more favorably.

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit refined the approach required in evaluating Title VII claims. Eschewing the "rat's nest of surplus tests" to evaluate Title VII claims (including direct versus indirect methods of proof), the court refocused the inquiry on "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Under this inquiry, "[e]vidence must be

14

considered as a whole" regardless of whether it is "direct" or "indirect." *Id*. Ultimately, a plaintiff facing summary judgment must produce sufficient evidence that a rational jury could conclude that the employer took the adverse action against the plaintiff because she belongs to a protected class.

The burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), remains a valid—but nonexclusive—method of proving a Title VII claim. *Ortiz*, 834 F.3d at 766. Under the *McDonnell* framework, a plaintiff must state a *prima facie* case of discrimination by demonstrating four elements: (1) they are a member of a protected class; (2) they were meeting their employer's legitimate performance expectations; (3) they suffered an adverse employment action; and (4) at least one similarly-situated employee, not in their protected class, was treated more favorably. *McDonnell*, 411 U.S. at 802. If a plaintiff establishes a *prima facie* case, then "the burden shifts" to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action which, if believed by a trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 n.2 (7th Cir. 2014).

Defendant argues that Plaintiff has failed to state a *prima facie* case under *McDonnell* because Plaintiff did not suffer an adverse employment action and cannot establish that similarly-situated male employees were treated better. Plaintiff counters that she need not proceed under the burden-shifting framework of *McDonnell* as

she has presented enough evidence to prevail under *Ortiz*, and, in the alternative, she has presented a *prima facie* case under *McDonnell*.

Starting with *McDonnell*, the parties agree that Brown has satisfied the first element because she is a member of a protected class—actually two, African American and female. For the purposes of this motion, CTA agrees that Brown satisfied the second element and was meeting CTA's reasonable performance expectations. (Dkt. 42, 10) CTA disputes whether Brown suffered an adverse employment action, and whether she has identified any similarly-situated individuals outside the protected class who were treated better than she was.

Adverse employment action "has been defined quite broadly in this circuit." *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008). The Seventh Circuit has recognized that it is "impossible" to create a "precise list of activities that constitute adverse employment actions," and whether an act is adverse depends on the "unique circumstances of individual cases." *Id.* Nevertheless, an adverse employment action must be "materially adverse, 'meaning more than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)); *see also Lewis v. Wilkie,* 909 F.3d 858, 870 (7th Cir. 2018) ("not everything that makes an employee unhappy is an actionable adverse action"). Some examples of adverse employment actions include: termination or suspension, demotion evidenced by a decrease in wage or salary, denial of a raise or fringe benefits, less distinguishable title, material loss of benefits, significantly reduced material responsibilities, and unbearable changes in job conditions such as a hostile work environment.

*Atanus,* 520 F.3d at 677; *see also Farrell v. Butler Univ.*, 421 F.3d 609, 614 (7th Cir. 2005) (stating that "the denial of a raise qualifies as an adverse employment action"); *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003) ("A discriminatory denial of job-related training can constitute an adverse employment action under Title VII."); *Markel v. Bd. of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) (adverse employment actions are generally "economic injuries").

Brown argues that she suffered several materially adverse actions: being paid significantly less than her white male counterparts; being required first to perform all of her discipline at CTA headquarters, and then to have Bond's approval to discipline frontline employees; being prevented from filling in for the Chief Maintenance Officer position; being instructed not to speak with her frontline employees, which prevented her from attending Rap Sessions and Toolbox Talks, supervising effectively, and being forced to perform spot checks and line rides outside of normal working hours; being prohibited from using the bathroom; being transferred to a position which had a farther commute with different railcars;  and after her transfer, being denied training on the 5000 series railcars.[10]

CTA argues that Brown has not experienced an adverse employment action because she is still a CTA employee; the salary differential can be explained by a skill differential; Bonds' rules for disciplining employees rules applied to all GMs; all GMs were expected to do line rides and spot checks; the quality of Brown's company car "is

---

[10] Plaintiff also argues that Bonds threatened to remove her from CTA and threatened that she would not get a raise. However, threats of future discipline are not adverse employment actions. *Lewis v. Wilkie*, 909 F.3d 858, 869-870 (7th Cir. 2018).

not material"; her lateral transfer did not result in a pay reduction and benefitted her because she learned about a new series of railcars, and CTA did not have any training it could provide to Brown.  (Dkt. 61, 4)

Based on the relevant caselaw and viewing the record as a whole, the Court finds that Plaintiff has presented sufficient evidence of an adverse employment action to defeat summary judgment. A reasonable jury could find that several of the following actions constitute an adverse employment action. First, the pay disparity between Brown and Matuszak and Dietrich, and the denial of a raise, constitute an adverse employment action. *Farrell*, 421 F.3d at 614 (denial of raise qualifies as an adverse employment action); *see also Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004). Second, a reasonable jury could find that Bonds' removal of her disciplinary authority and prohibition of speaking to frontline employees significantly diminished her material responsibilities and impeded her ability to manage effectively. *See Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012) (adverse employment action can be evidenced by "significantly diminished material responsibilities"). Finally, the denial of training can be an adverse employment action. *Durkin*, 341 F.3d at 611.

There are many factual issues regarding the adverse employment actions, making this issue ripe for a jury. For example, CTA claims there was no training on the 5000 series railcars, yet Bonds' deposition says classroom training was available. (Dkt. 49, Ex. E, 73:22-75:16) Brown and Roberts maintain that general rules were only enforced against her, yet CTA denies this was the case. CTA claims Matuszak was paid more because of previous management experience, yet CTA's own internal

18

investigation stated that "the reason for the [salary] discrepancy cannot be explained by years of relevant experience and/or merit." (Dkt. 49, Ex. G, 7) A reasonable jury could find that Brown suffered an adverse employment action.

However, not all actions listed by Brown constitute an adverse employment action. For example, the bathroom prohibition, while troubling, is not a material adverse employment action. It is not the type of material or economic injury recognized by the Seventh Circuit. Additionally, the denial of a new company car when every other GM was provided one also does not rise to the level of an adverse employment action. *See O'Neal v. City of Chi.*, 317 F. Supp. 2d 823, 828 (N.D. Ill. 2004) (fringe benefits like a company car "fall[] under the types of 'perks' and 'idiosyncratic terms' that are a 'purely subjective preference' for some employees") (citing *Herrnreiter v. Chi. Housing Authority*, 315 F.3d 742, 745 (7th Cir. 2002)). Neither does Brown's transfer qualify as an adverse employment action. All GMs were transferred at the same time, she received no reduction in pay, and her job duties were not significantly different, despite the fact that the new location involved different railcars. *Herrnreiter*, 315 F.3d at 744 (distinguishing between actionable lateral transfers, and cases involving "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance…[Such a transfer] cannot rise to the level of a material adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.").

In addressing whether Plaintiff has identified similarly-situated employees outside the protected class who were treated more favorably—the Court must

"conduct a common-sense examination" of potential comparators, who "need not be identical in every conceivable way" to the Plaintiff. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013); *see also Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (noting that there is no "magic formula" for identifying relevant comparators and that "the similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees"). To be similarly situated, a plaintiff typically demonstrates that her performance, qualifications, and conduct were comparable to that of a member of the non-protected class. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). Generally, "whether individuals are similarly situated is a factual question for the jury." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004). "However, a court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *Id*.

Brown posits that Matuszak and Dietrich, both white men, were similarly-situated employees. Matuszak, Dietrich, and Brown "were all the same type of GMs" and all reported to Roberts and Bonds. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 3, 4, 16) Brown has also presented evidence that Matuszak, Dietrich, and Brown were all paid a similar salary in 2014. (*Id*. at 14) This changed in 2015, when Matuszak and Dietrich received raises and Brown's salary remained the same. (*Id*.)

CTA claims that Matuszak and Dietrich were not similarly-situated to Brown because "they had more overall experience, experience with 5000 series rail cars, more time in the GM position and both of them served as [Heavy Maintenance]

GMs…" (Dkt 42, 17) CTA also argues that Matuszak and Dietrich are not similarly situated because did not have as many complaints launched against them, and did not engage in the same disruptive and aggressive conduct as Brown. (Dkt. 61, 12-13) (citing *Williams v. Extra Space Storage, Inc.*, No. 16 C 3313, 2019 WL 2994530, at *5 (N.D. Ill. July 9, 2019) (where the court found that the plaintiff needed to present evidence that a co-worker engaged in conduct similar to the plaintiff's conduct, in order to be similarly situated)). Brown counters this last point by pointing to evidence that all three GMs received a similar number of complaints, suggesting that Brown's management style was not particularly aggressive or problematic. (Dkt, 49, Pl.'s Stmt. of Facts ¶ 37)

As indicated, CTA's own internal investigation into Brown's salary concluded: "the reason for the [salary] discrepancy cannot be explained by years of relevant experience and/or merit." (Dkt. 49, Ex. G, 7) This fact suggests that Matuszak and Dietrich's experience was not significantly different from Brown's, at least according to the CTA. Brown has also presented evidence that Matuszak did not have special experience with the 5000 series railcars. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 33) Additionally, the record shows that Brown's position had more responsibility than Matuszak's and Dietrich's, not the other way around. (Dkt. 49, Pl.'s Stmt. of Facts ¶ 15) Brown also argues that CTA's explanation, that Matuszak and Dietrich had more outside management experience and thus deserved a higher salary, would explain a higher starting salary bracket. But all three of them began at the same salary, and then two of them receive raises. It will be up to the jury to determine whether this could be based

21

on "previous experience." Brown has also provided evidence that all the GMs received the same number of complaints, suggesting that all three individuals behaved similarly. (Dkt, 49, Pl.'s Stmt. of Facts ¶ 37) Brown has presented enough evidence to demonstrate that Matuszak and Dietrich were similarly-situated employees.

Brown has also provided sufficient evidence that Matuszak and Dietrich were treated more favorably. Aside from the greater salary, Brown has provided evidence that Matuszak and Dietrich received a new company car when she did not; CTA's policies requiring GMs to impose discipline at CTA headquarters and conduct spot checks and line rides were only enforced against her, and not against Matuszak or Dietrich; Matuszak was given more opportunities to fill in for the CMO position; and Dietrich and Matuszak were not prohibited from speaking to their frontline employees. Accordingly, Brown has satisfied the fourth prong of *McDonnell*, and has thus presented a *prima facie* case of discrimination.

Once a plaintiff has presented a *prima facie* case of discrimination, the burden shifts to defendant to give a non-discriminatory reason for treating the plaintiff the way it did, and if the defendant met *its* burden, the burden shifts back to the plaintiff to show that defendant's explanation was pretext. *McDonnell,* 411 U.S. at 804. CTA has offered legitimate, non-discriminatory reasons for its actions—it claims Bonds received complaints about Brown's management style, all the disciplinary and performance rules applied to all GMs equally, and the other GMs had more experience justifying the pay disparity. To demonstrate that CTA's non-discriminatory reasons are pretext, Brown must "identify such weaknesses, implausibilities, inconsistencies,

or contradictions" in CTA's asserted reasons "that a reasonable person would find [them] unworthy of credence." *Coleman*, 667 F.3d at 852-53. As fleshed out above, Brown has done so here. She survives summary judgment under the *McDonnell* framework.

As noted, *Ortiz* holds that courts must look beyond the *McDonnell* analysis to examine whether the plaintiff has presented evidence that, considered as a whole, would allow a reasonable juror to conclude that the defendant violated Title VII. *Ortiz*, 834 F.3d at 765. Plaintiff has done so here. Brown has presented facts that she suffered negative employment actions and she was treated differently in material ways from similarly-situated male employees. However, Brown has failed to demonstrate that the adverse employment actions were caused by both sex *and* race discrimination. The evidence presented only ties the above-listed employment actions to discrimination based on her gender, not discrimination based on her race. Accordingly, Plaintiff may proceed on the theory that CTA discriminated against her on the basis of sex. The Court denies CTA's motion for summary judgment on the Title VII discrimination claims.

## 2) Title VII Retaliation—Race

To prevail on a Title VII retaliation claim, a plaintiff must prove that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Like discrimination, retaliation may be established under the *McDonnell* framework or under *Ortiz*. *Williams*

23

*v. Office of Chief Judge of Cook Cty.,* 839 F.3d 617, 626 (7th Cir. 2016). Thus, in evaluating whether Brown's Title VII retaliation claim survives summary judgement, the Court will consider evidence she presents in her favor as a whole. The Court will consider whether Brown made out a *prima facie* case, but will ultimately focus on the more general inquiry of whether a reasonable jury could find that CTA retaliated against Brown. *See Harris v. Chi. Transit Auth.*, No. 14 C 9106, 2017 U.S. Dist. LEXIS 154969, at *12 (N.D. Ill. Sep. 22, 2017).

CTA argues that Brown did not engage in a statutorily protected activity. CTA also challenges Brown's ability to establish an adverse employment action or causation: it argues that, to the extent Brown argues she was retaliated against following her November 2015 and December 2015 meetings with CTA's internal EEO unit, there is no evidence she suffered an adverse employment action following those meetings.[11]

Generally, an employee engages in a protected activity by either: (1) filing a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII or other employment statutes, or (2) opposing an unlawful employment practice. *Northington v. H & M Int'l,* 712 F.3d 1062, 1065 (7th

---

[11] CTA also argues that Brown failed to provide evidence that Bonds knew of Brown's internal EEO complaint, and that the internal complaint found "insufficient evidence to conclude" that Bonds discriminated against Brown. (Dkt. 48, Ex. G, 6) (emphasis in original). Regarding Bonds' knowledge, the Court finds it not credible that CTA's internal investigators interviewed Bonds yet CTA maintains he had no knowledge of any internal EEO investigation. *Compare* (Dkt. 61, 14) (stating that Plaintiff fails to present any evidence that Bonds knew of Plaintiff's EEO complaint) *with* (Dkt. 48, Ex. G, 4-7) (describing Bonds' interview as part of the EEO internal investigation and reporting the findings of the investigation). Additionally, CTA's internal investigation finding insufficient evidence to establish misconduct had occurred, does not preclude a jury from finding that CTA retaliated against Brown.

Cir. 2013). Brown argues she engaged in two protected activities. First, she has provided evidence that she made an internal EEO complaint regarding sex discrimination and her pay disparity in December 2015, and she filed a charge of sex and race discrimination with the EEOC in July 2016. (Dkt. 48, Ex. P); *Silverman v. Board of Edu. of City of Chicago*, 637 F.3d 729, 740 (7th Cir. 2011) (an EEOC charge is "the most obvious form of statutorily protected activity"); *see* 42 U.S.C. § 2000e-3(a). Second, Brown has presented evidence that she refused to engage in an unlawful employment practice. Specifically, Brown claims that she refused to discriminate against non-black employees when administering discipline. The Court will address each activity in turn.

### A. Internal EEO Complaint and EEOC Charge

As mentioned above, filing an internal complaint or a charge with the EEOC is a quintessential protected activity. To prevail on summary judgment, then, Brown must present evidence that she suffered an adverse employment action after filing either the internal EEO complaint or the EEOC charge, and that there is a causal link between the protected activity and the adverse employment action.

Brown has identified many adverse employment actions. However, the only two actions that occurred after Brown's filing of an internal EEO complaint and the EEOC charge is Brown's transfer to the Redline and the accompanying denial of training. As discussed above, no reasonable jury could find that the transfer was an adverse employment action. All GMs were transferred at the same time, Brown received no reduction in pay, and her job duties were not significantly different, despite

the fact that the new location involved a different series of railcars. *Herrnreiter v. Chi. Housing Authority*, 315 F.3d 742, 745 (7th Cir. 2002) (distinguishing between actionable lateral transfers, and cases involving "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance…[Such a transfer] cannot rise to the level of a material adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either.").

The denial of training after Brown's transfer could be an adverse employment action. Although CTA claims it had no training to give Brown, Brown has presented evidence that training existed, training was to be given freely, and her requests for training were repeatedly denied. Based on the record, a reasonable jury could determine that CTA's denial of training was an adverse employment action. *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003) ("A discriminatory denial of job-related training can constitute an adverse employment action under Title VII.").

However, Brown has not demonstrated that the denial of training has a causal link with her protected activity. The standard for demonstrating causation for a Title VII retaliation claim is whether, considering the evidence as a whole, the defendant took an adverse employment action because the plaintiff engaged in a protected activity. *Ortiz*, 834 F.3d at 765; *Williams*, 839 F.3d at 627. Factors to consider in this analysis include suspicious timing, ambiguous statements of animus, whether other employees were treated differently, or evidence that the explanation for the adverse employment action was pretextual. *Greengrass v. Int'l Monetary Sys., Ltd.,* 776 F.3d

481, 486 (7th Cir. 2015); *see also Coleman,* 667 F.3d at 860. Brown's only evidence of causation is suspicious timing. However, the temporal gap between Brown's protected activity and the denial of training is too long to raise an inference of causation. Brown's transfer and denial of training occurred almost nine months after she filed her EEOC charge, and almost fifteen months after she made the internal EEO complaint.[12] *Carter v. Chi. State Univ.*, 778 F.3d 651, 658 (7th Cir. 2015) (holding a temporal proximity of seven months was not suspicious); *Naficy v. Ill. Dep. of Human Servs.*, 697 F.3d 504, 513 (7th Cir. 2012) (holding nine-month gap did "little to raise suspicion"); *Jajeh v. County of Cook*, 678 F.3d 560, 570 (7th Cir. 2012) (concluding that a five month gap between protected activity and adverse action did not amount to suspicious timing). No reasonable jury could find that CTA retaliated against Brown for filing an internal EEO complaint or her EEOC charge.

### B. Refusing to engage in an unlawful employment activity

Brown's second protected activity involves opposing an unlawful employment practice by refusing to exempt black employees from discipline. Her refusal to discriminate qualifies as a protected activity. *See Rinella v. City of Chi.*, No. 16 C 04088, 2016 U.S. Dist. LEXIS 173198, at *16-18 (N.D. Ill. Dec. 14, 2016) (collecting cases). Thus, to defeat summary judgment, Brown must present evidence that she suffered an adverse employment action and causation between the protected activity and the adverse employment action.

---

[12] Brown made her internal EEO complaint in December of 2015, and her EEOC charge in July 2016. Brown was transferred in March or April of 2017. (Dkt. 49, Df.'s Stmt. of Facts ¶¶ 2, 35, 36)

Brown has presented evidence that she suffered several adverse employment actions. According to Brown, after she refused to follow Bonds' orders regarding disciplining black employees, Bonds first required her to conduct discipline at headquarters and then removed her disciplinary authority completely. Bonds then prohibited her from interacting with, and speaking to, her frontline employees, which prevented her from attending Toolbox Talks and Rap Sessions and required her to perform spot checks and line rides at odd hours. A jury could find that these two actions "significantly diminished [her] material responsibilities." *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012). Brown has also presented evidence that she was denied a raise, while Matuszak and Dietrich received one. Brown has presented a triable question as to whether she suffered an adverse employment action after she engaged in protected conduct.

Again, the standard for demonstrating causation for a Title VII retaliation claim is whether, considering the evidence as a whole, the defendant took an adverse employment action because the plaintiff engaged in a protected activity. *Ortiz*, 834 F.3d at 765; *Williams*, 839 F.3d at 627. Factors to consider include suspicious timing, ambiguous statements of animus, whether other employees were treated differently, or evidence that the explanation for the adverse employment action was pretextual. *Greengrass v. Int'l Monetary Sys., Ltd.,* 776 F.3d 481, 486 (7th Cir. 2015). Here, Brown has sufficiently tied her adverse employment actions to her protected activity and her race. She has presented evidence that Bonds made comments about "protecting your own" while pointing to his skin, and Bonds suggested Brown was betraying her race.

When Brown refused to conform to Bonds' demands, Bonds directly threatened that she would not see a raise or new company car. Brown has also provided evidence that other employees, such as Matuszak and Dietrich, were treated differently. They were permitted to administer discipline in the field, received a new company car when Brown did not, and received a raise when Brown did not. Matuszak was not disciplined for failing to perform his spot checks and line rides, and he was given more opportunities to fill in for higher level positions. These events are also temporally linked. Bonds made the comments about protecting their own kind in August of 2015, and began removing her disciplinary authority in October 2015. (Dkt. 49, Df.'s Stmt. of Facts ¶¶ 26, 33-34; Dkt. 49, Pl.'s Stmt. of Facts ¶ 18) Brown's temporal nexus is close enough to raise an inference of retaliation.

Brown has presented enough evidence in her favor to overcome CTA's motion for summary judgment on her retaliation claim. She has assembled an array of circumstantial evidence such that a reasonable jury could conclude that CTA retaliated against her for refusing to treat black employees differently. Importantly, Brown has demonstrated that this retaliation stemmed from racial animus and from her refusal to discriminate against non-black employees. She has not demonstrated that CTA retaliated in any way based on her gender. Accordingly, Brown may only proceed under the theory that on her retaliation claim based on her race.

### 3) Equal Pay clams

Plaintiff did not raise any Equal Pay Act claims in her First Amended Complaint. However, in her response to summary judgment, Plaintiff made arguments

under the Equal Pay Act. (Dkt. 48, 11) CTA requests that the Court disregard any arguments under the Equal Pay Act, and notes that "[a]t no point did Plaintiff seek to amend the complaint to add an [Equal Pay Act] claim." (Dkt. 61, 16 n. 7)

Generally, a plaintiff "may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgement." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). But when a plaintiff does raise a new claim in summary judgment briefing, "the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories plaintiff has pursued so far." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (citing *Whitaker v. Milwaukee County, Wisconsin*, 722 F.3d 802, 808-09 (7th Cir. 2014)). In the former scenario, the plaintiff may be attempting to impermissibly amend her complaint, and the district court may decline to hear the new claims. In the latter, the court should consider the consequences of allowing the plaintiff's new theory. "If it would, for example, 'cause unreasonable delay,' or make it 'more costly or difficult' to defend the suit, 'the district court can and should hold the plaintiff to [her] original theory." *Chessie*, 867 F.3d at 859 (citing *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996)) (noting that "the district judge who is managing the case is ordinarily in the best position to answer these questions and to exercise sound discretion").

Here, Plaintiff is not merely altering her legal theory or recharacterizing her already existing claims. She is attempting to bring an additional claim—in effect, amending her complaint. Allowing Brown's Equal Pay Act claim to proceed at this

late stage would surely prejudice CTA. The Court declines to address Plaintiff's arguments under the Equal Pay Act or allow Plaintiff to raise an Equal Pay Act claim at this late date.

## CONCLUSION

For the reasons stated above, the Court denies in part and grants in part CTA's motion for summary judgment (Dkt. 42). Brown may proceed under the theory of gender discrimination and retaliation based on her refusal to participate in discriminatory conduct. Brown may not proceed on any claim that she was discriminated against based on her race or that she experienced retaliation because of her filing an internal EEO complaint or complained to the EEOC.

E N T E R:

Dated: February 14, 2020

MARY M. ROWLAND
United States District Judge